[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by the plaintiff from an assessment of damages by the defendant for the taking of a portion of her property in the Town of Enfield, as shown on a map entitled "TOWN OF ENFIELD MAP SHOWING LAND ACQUIRED FROM IRENE PAVLAKIS BY THE CT Page 5842 STATE OF CONNECTICUT RECONSTRUCTION OF CONN. 220 SCALE 1" = 40' DECEMBER 1989 ROBERT W. GUBALA TRANSPORTATION CHIEF ENGINEER BUREAU OF HIGHWAYS." A certified copy of the taking map was introduced into evidence as Exhibit A. The property taken was also described in the complaint. The parties stipulated that the date of the taking was May 28, 1991, and that damages as assessed by the defendant in the sum of $119,000 were deposited by the defendant with the clerk of the superior court and have been withdrawn by the plaintiff.
The Town of Enfield is in the north central portion of the State and is serviced by Interstate Route 91, a main north-south traffic artery. The Town has seen significant commercial and industrial development and contains several shopping malls. It also has several large residential areas.
The subject property is in the north central section of the Town of Enfield and lies on the southerly side of Route 220, also known as Shaker Road. The neighborhood is a mixture of residential and commercial uses. There is an industrial development to the west of the subject property, but land to the east and south is woodland or open space. To the north, on the other side of Shaker Road, there are residential developments. The subject property is zoned for industrial use, although it had a single family dwelling on the westerly portion of the property before the take. The dwelling house existed before the land was zoned Industrial and was a legal nonconforming use. Also situated on the property were a barn and a five acre tobacco shed. It seems likely that there will be additional industrial development in the area in the future. The land has been used for agricultural purposes and such interim use seems likely to continue until industrial development becomes economically feasible.
The frontage of the subject property along Shaker Road was split when a lot with 200 feet frontage was conveyed to a son of the plaintiff. The split frontage on Shaker Road before the taking was 278.79 feet to the west of the son's lot and 650 feet to the east of the son's lot, a total of 928.79 feet. The property contained 23.47 acres and was irregular in shape, having a depth on the easterly side of 770 feet, more or less, and a depth on the westerly side of 1,500 feet, more or less. The southerly boundary seems to follow a small brook known as Freshwater Brook. There is also a small brook along part of the westerly property line. There is a right of way in favor of the Town of Enfield along the southerly boundary. The land is gently rolling and varies from about five feet above street grade to about four feet below street grade. It descends gradually from north to south. Some of the subject property has been planted and some of it is wooded. Some wetlands exist at the southerly CT Page 5843 end of the property and probably at the eastern and western boundaries. There is an undefined gas easement in favor of Mobil Pipe Line Company encumbering the subject property. Public utilities available include telephone, electricity, public water, gas and sewer system. The property is serviced by an artesian well and septic system, however. On the westerly portion of the subject property, along Shaker Road and to the west of the dwelling, there are a large number of evergreens and some ornamental shrubs and other trees. On the easterly portion of the subject property, within the taking area, along Shaker Road, the property is quite densely wooded and contains several large hardwood trees. The dwelling contains one and one-half stories and is of frame construction. It has within it a kitchen, bathroom, living room, two bedrooms and an enclosed porch. There is a basement containing a lavatory and shower and a partly finished attic. The house is turn of the century and in average condition.
The highest and best use of the subject property before the take was continued residential use of the dwelling house and industrial use of the remaining acreage.
The take is in two parcels along the split frontage of the subject property. Parcel Number 1 consists of 0.197 acres, more or less, along the westerly frontage of the subject property, and is 34 feet, more or less, in depth. Parcel Number 2 consists of 0.474 acres, more or less, along the easterly frontage of the subject property, and is 32 feet, more or less in depth. Also taken were the rights and easements hereinafter described.
As to Parcel Number 1:
 An easement to slope for the safety of the highway, excavate channel, place riprap and remove, use or retain excavated material within an area of 0.091 of an acre, more or less;
 A drainage right of way within an area of 0.025 of an acre, more or less;
 A right to construct a driveway within an area of 0.019 of an acre, more or less, the right to terminate upon completion of the work, and a right to possess and remove the dwelling.,
As to Parcel Number 2:
 An easement to slope for the support and safety of the highway and remove, use or retain CT Page 5844 excavated material within an area of 0.057 of an acre, more or less;
 A drainage right of way within an area of 0.015 of an acre, more or less;
 A right to grade within an area of 0.005 of an acre, more or less, the right to terminate upon completion of the work.
After the take, the subject property will contain 22.799 acres, more or less, subject to the easements and rights which were taken. The dwelling house will be removed, but the garage and tobacco shed will remain. A large number of trees and some shrubs will be in the taking area.
The plaintiff opined that the value of the subject property before the take was $150,000 for the house and $50,000 per acre.
The plaintiff called David N. Collins, a qualified real estate appraiser, as an expert witness. Collins opined that the nonconforming residential use would terminate with the taking and that it could not be assumed at the date of taking that the Zoning Board of Appeals would permit construction of a residence after the taking, even though in fact a new residence had been erected at the time of his appraisal. He concluded that the highest and best use of the subject property after the taking was for future industrial use in accordance with zoning. He used comparable sales of residential properties to establish a value for what he considered the house lot and comparable sales of industrial properties to establish a value for the remaining land. He used the cost approach to establish a value for the dwelling house and other buildings. He concluded that before the take, the fair market value of all the land with improvements was $861,500, the fair market value of all buildings was $73,500, and that the total fair market value before the take was $935,000. Collins opined that after the take, the dwelling house would be gone and the site improvements would have no value to the remaining acreage. He opined that the rights and easements taker were almost equivalent to a complete taking, except that the right to construct a driveway would not be detrimental. He opined that the taking of the drainage right of way in Parcel Number 2 was very detrimental to the remaining property because a 24 inch culvert would empty onto it. He believed that an area of as much as two acres along the easterly boundary might be flooded in some seasons. He opined that the fair market value of the subject property after the taking was $738,700. He thus estimated damages at $196,300. CT Page 5845
The defendant called Eric Chiapponi, a qualified real estate appraiser, as an expert witness. He assumed that a subdivision of the dwelling site would have been allowed before the take and opined that the highest and best use of the subject property before the take was for residential use of a homesite lot and industrial use of the remaining acreage. He used the sales comparison approach to value for both the residential portion and the industrial portion of the subject property, and he used the cost approach to estimate value of the house and garage to support his conclusions. He used an "x" factor for the value of the tobacco shed because in his opinion it was not affected by the take. Using comparable sales, Chiapponi concluded that the fair market value of the dwelling and other improvements with a minimum sized lot before the take was $120,000. He concluded that the fair market value of the remaining land was $590,000. He opined that the total value of the subject property before the take was $710,000 plus "x". He was of the opinion that the drainage right of way at the westerly edge of the property would affect the wooded area separating it from the abutting industrial site. After the take, the dwelling was to be removed but the garage and tobacco shed would remain. Chiapponi opined that the highest and best use of the subject property after the take was as industrial acreage and that the barn and shed would add no contributory value. He did not consider residential development because it could not be assumed that necessary permits could be obtained. He did not consider residential valuation of a homesite after the take because the highest and best use of the total remaining land in his opinion was for industrial development. He opined that the value of the subject property after the take was $591,000 plus "x". Chiapponi thus estimated damages at $119,000.
Although the plaintiff had no plans for development, and it would not be feasible to attempt it at this time, the subject property is in an Industrial zone and industrial development at the proper time is the highest and best use to which this property can be put. It does not seem likely that the 24 inch culvert to be installed in the drainage right of way at the easterly end of the property will cause flooding. The speculation by Collins that two acres might be flooded was not based upon a survey, as he candidly admitted, and was nothing more than a guess.
The duty of a referee in an appeal from an award for the acquisition of property by eminent domain is to reach his own conclusion of value by weighing the opinions of the appraisers and the claims of the parties in light of all the circumstances bearing on value and of his own knowledge of the elements affecting value. CT Page 5846
After having seen the property, and having given due consideration to the testimony of all the witnesses and to all of the evidence, and relying upon my own knowledge of the elements establishing value, I have concluded that the damages sustained by the plaintiff were $130,000. Judgment may enter for the plaintiff for the further sum of $11,000 in addition to the sum of $119,000 which was deposited by the defendant and withdrawn by the plaintiff, with interest on the said further sum of $11,000 from the date of taking to the date of payment, together with costs and an allowance towards her appraisal fees of $1,500.
George D. Stoughton State Trial Referee